Wayne THOMPSON, Plaintiff,

v.

PRICE BROADCASTING COMPANY,
a Utah Corporation, d/b/a KCPX
Radio, AM & FM, Defendant.

Civ. No. 89–C–845.

United States District Court,
D. Utah, C.D.

March 12, 1993.

David L. Grindstaff, Salt Lake City, UT, for plaintiff.

Stanley J. Preston, Snow, Christensen & Martineau, Salt Lake City, UT, for defendant.

## MEMORANDUM DECISION

### (In Lieu of Findings of Fact and Conclusions of Law—FRCP 52(a))

ALDON J. ANDERSON, Senior District Judge.

Wayne Thompson (hereafter "Thompson") brought this race discrimination action against his former employer, Price Broadcasting Company d/b/a KCPX (hereafter referred to as "Price" or "KCPX"), for allegedly discharging him in violation of Title VII of the 1964 Civil Rights Act, 42 U.S.C. §§ 2000e–2000e–17. Trial was held before the bench on February 11–12, 1993, and the matter was taken under advisement.

Having reviewed the evidence presented, and the arguments of counsel for the parties, the Court is now prepared to enter its decision and judgment. Before doing so, however, the Court emphasizes that the only issue before the Court is Thompson's entitlement to relief under Title VII. Other claims made by Thompson against Price, including a claim for common law wrongful discharge, were dismissed earlier in the case when Thompson failed to oppose various motions by Price.[1] Consequently, evidence presented at trial relating to Price's employment manual and guidelines is not controlling in this matter.[2] With regard to Thompson's remaining Title VII claims, the Court determines that

---

1. Thompson's original complaint against Price included a claim for violation of Title VII. In addition, the complaint included a constitutional claim under 42 U.S.C. § 1981 for violations of the due process and the equal protection clauses of the United States Constitution; a statutory claim for violations of the Utah Anti–Discriminatory Act, Utah Code Ann. § 34–35–1 et seq., and a common-law claim for wrongful discharge. Price moved to dismiss those claims, and Thompson did not oppose the motion. In addition, Price moved to strike Thompson's request for punitive damages for violation of Title VII. Thompson also failed to oppose that motion. After reviewing Price's motions, and Thompson's failure to respond to the same, this Court, through District Judge David Sam, granted the motions.

2. On its face, Thompson appears to have been an employee-at-will. Consequently, his employer Price could fire Thompson with or without cause, so long as the motivation for the firing was not violative of statutes such as Title VII. *Rose v. Allied Development Co.*, 719 P.2d 83, 84–85 (Utah 1986). Employment manuals and/or guidelines, however, can sometimes give rise to contracts of employment, either express or implied-in-law, and provide protection to employees from being fired without good cause. *See Berube v. Fashion Centre, Ltd.*, 771 P.2d 1033, 1044 (Utah 1989). *Compare Johnson v. Morton Thiokol, Inc.*, 818 P.2d 997 (Utah 1991).

Thompson failed to meet his burden of proof at trial that Price discharged Thompson in violation of Title VII. Consequently, judgment will be entered in favor of defendant, no cause of action on plaintiff's complaint.

## I. FACTUAL BACKGROUND.

Thompson is a 36 year old African–American male who has worked since 1980 in the broadcasting industry. During that time, Thompson has worked in radio production, and has acted as a radio personality ("Disk Jockey"). As a Disk Jockey, Thompson is aware that listeners develop listening habits and loyalty to radio stations because of the particular personalities involved. Thus, radio stations require their Disk Jockeys to make every effort possible to be on at work in sufficient time to go "on the air" for their assigned times slots.

On October 14, 1988, Thompson was hired by Price to work part time as a KCPX Disk Jockey for the Sunday afternoon time slot of 2:00 p.m. to 9:00 p.m. Prior to working for Price, Thompson worked as a Disk Jockey for Radio Station KDAB in Ogden, Utah, where Thompson resided. KCPX is located in Salt Lake City, Utah, and Thompson agreed to provide his own transportation to and from work on Sundays.

Shortly after going to work for Price, Thompson brought a Title VII lawsuit against his former employer KDAB for allegedly firing him because of his race. This lawsuit was publicized in the local newspapers, and a copy of an article relating to the suit was cut out by an unknown employee of Price, and placed on the desk of Thompson's supervisor, David Leppink, whose radio name is Morgan Evans (hereafter "Evans").[3] Evans acknowledged seeing the article, but testified that it played no part in his decision making with regard to Thompson.

A few days after the local newspapers publicized Thompson's suit against KDAB, a snow storm hit the northern parts of Utah. By 4:00 p.m., Mountain Standard Time, on Saturday, November 26, 1988, driving conditions in the Ogden area became hazardous as a result of snowy and icy roads. Thompson, being concerned about the driving conditions, telephoned Evans' home at 4:43 p.m. to inform Evans that he would not be coming into KCPX the next day for his radio slot. Evans was not home, and Thompson left a message on Evans' answering machine.[4]

When Evans returned home at approximately 4:50 p.m. he listened to the telephone message from Thompson and telephoned Thompson's house. Mrs. Thompson answered the telephone, and informed Evans that her husband was not at home, and was at Lionel Playworld in Ogden where he had a second job.[5] Evans informed Mrs. Thomp-

---

**3.** Evidence was presented that Price was aware of Thompson's difficulties with his prior employer, KDAB, at the time of Thompson's hiring. The newspaper article, however, was the first notice to Price that Thompson was willing to sue an employer.

**4.** At trial, Thompson testified that when he telephoned Evans' home it was to request a day off because of the snow. Thompson stated that he had never received the employee guidelines from KCPX and, consequently, did not know the procedure to follow in getting a day off. Evans contested Thompson's account, and testified that Thompson simply refused to report to work. The Court is persuaded that the preponderance of the evidence is that Thompson informed KCPX, through Evans, that he would not be coming to work, and did not simply request a day off. This is supported by Thompson's own Complaint wherein it is alleged at paragraph 6 that: "On or about November 26, 1988, plaintiff informed his employer that due to inclement weather he would be unable to work the following day."

**5.** Price notes that the driving conditions in Ogden could not have been too severe, otherwise Thompson would not have driven to Lionel Playworld. Thompson counters that because the drive to Lionel Playworld took an abnormally long time, it establishes the hazardousness of the roads. Neither argument is critical to the case at hand, however. In that regard, the Court finds that the roads in Ogden were hazardous during the afternoon of Saturday, November 26, 1988. At the same time, the Court believes the relevant inquiry is not the status of the roads on Saturday, but rather the anticipated road conditions for Sunday, November 27, 1988. The anticipated road conditions, as shown by the evidence, indicates that the weather was clearing, and that road conditions would improve. Unfortunately, neither party really cared about the anticipated road conditions. Evans wanted Thompson to show up for work regardless of road conditions, and Thompson was not going to drive the freeway between Ogden and Salt Lake City, regardless of what the weather was like on Sunday.

son that the roads in Salt Lake City were not too bad, and that he expected Thompson to be at work at 2:00 p.m. the next day. Evans further informed Mrs. Thompson that she should contact her husband to tell him that he was expected to report to work, and that if there was a problem Thompson should call Evans to talk about it.

Mrs. Thompson did as she was instructed and telephoned Evans' home thirty minutes later with her husband's reply. Evans had gone out, however, and Mrs. Thompson had to leave another message on Evans' answering machine. She stated that her husband still felt the same way, and that he would not be coming into work the next day. Five hours later, when Evans returned home and listened to his messages, Evans telephoned Mrs. Thompson to get Thompson's telephone number at Lionel Playworld.

When Evans spoke with Thompson at Lionel Playworld, he asked Thompson what the problem was. Thompson responded that KCPX did not pay him enough to risk his life driving down to Salt Lake City to do a shift. Evans responded that he needed someone he could count on every Sunday, regardless of the weather. When Thompson stated he would not be coming down to Salt Lake City the next day for the 2:00 p.m. shift, Evans fired him.

Following his firing by KCPX, Thompson brought race discrimination claims against Price before the Anti–Discrimination Division of the Industrial Commission of Utah ("ICU") and the Equal Employment Oppor-

tunity Commission of the United States ("EEOC").[6] The ICU and EEOC found no basis for Thompson's discrimination charges. Thompson, thereafter, brought the present action in the United States District Court, where he was entitled to a de novo trial of the discriminations charges. See *Long v. Laramie County Community College Dist.*, 840 F.2d 743 (10th Cir.1988).[7]

## II. *Discussion*

There are two theories of employment discrimination under Title VII: disparate treatment and disparate impact. The disparate treatment theory focuses on the employer's intent to discriminate. *See Teamsters v. United States*, 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977). Disparate impact, on the other hand, requires no proof of discriminatory intent. Rather, a plaintiff need only show that the employer's practices are "discriminatory in operation." *Griggs v. Duke Power Co.*, 401 U.S. 424, 431, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971).

At trial, Thompson only sought relief for disparate treatment under Title VII; specifically discriminatory discharge under 42 U.S.C. § 2000e–2, and retaliatory discharge under 42 U.S.C. § 2000e–3.[8] Consequently, Thompson needed to show discriminatory intent on the part of Price. Thompson failed to do so.

### A. *The Burden of Proof*

In *Trujillo v. Grand Junction Regional Ctr.*, 928 F.2d 973 (10th Cir.1991) the Tenth

---

6. Thompson's administrative claims were brought pursuant to 42 U.S.C. § 2000e–5, sub-paragraphs (b) & (c), which provide that before a discrimination action may be commenced in the United States District Court, the discrimination claims must first be submitted for administrative investigation and review by the state commission authorized by state law to deal with discrimination matters, and then to the EEOC, which, in turn, must give substantial weight to the findings of the state commission.

7. Although Thompson was entitled to a de novo trial of his discrimination claims, the findings of the IUC and EEOC are relevant evidence that may be considered by the court. *See Long v. Laramie County Community College Dist.*, 840 F.2d 743 (10th Cir.1988).

8. Before the ICU and EEOC, Thompson claimed, in addition to his termination and retaliation

claims, that KCPX management conspired to discriminate against him in terms and conditions of employment, extra compensation, employee grievances, training, and job application procedures. In addition, Thompson claimed, before the ICU and EEOC, that he had been subjected to racial slurs and a constant air of racially motivated patronization. Absolutely no evidence was presented by Thompson at trial in support of any of these additional discrimination claims. When asked by the Court during closing arguments about the additional claims, and whether or not Thompson's sworn statement to the ICU and EEOC was true, Thompson's counsel responded that the IUC and EEOC charge was "like a prepared form to put—to have people kind of like in an assembly mill thing, that covers all bases." Partial Transcript at 48.

Circuit Court of Appeals set forth its understanding of the United States Supreme Court's requirements to establish a disparate treatment case. The court states:

> As the [United States Supreme] Court explained, a plaintiff has the ultimate burden of proving the defendant treated [him] less favorably than others because of [his] race.... A plaintiff first must establish a prima facie case of discrimination.... Once a plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate a legitimate nondiscriminatory reason for its action through the introduction of admissible evidence.... If the defendant meets this burden of production, a plaintiff then must prove by a preponderance of the evidence the employer's proffered reason for terminating the plaintiff was merely pretextual.... A plaintiff may prove pretext by showing that the employer, more likely than not, was motivated by a discriminatory reason or that the employer's explanation is not credible.... If a plaintiff meets this burden, [he] is entitled to recovery under Title VII.

*Id.* at 976–77, citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).[9] The requirements apply to both discriminatory discharge and retaliatory discharge claims.[10]

### B. *The Prima Facie Case*

#### 1. *Thompson's Discriminatory Discharge Claim*

Title VII of the 1964 Civil Rights Act makes it unlawful for an employer "to dis-charge any individual, or to otherwise discriminate against any individual ... because of such individual's race." 42 U.S.C. § 2000e–2(a)(1) (1988).

To establish a prima facie case for discrimination under Title VII, the plaintiff must show that: (1) he belongs to a protected group; (2) he was *qualified for his job;* (3) he was terminated despite his qualifications; and (4) after his termination, the employer hired someone or sought applicants for the plaintiff's vacated position, whose qualifications were no better than the plaintiff's.

*See Johnson v. Westinghouse Elec. Co.,* 752 F.Supp. 1000, 1002 (D.Utah 1990) (citations omitted).[11]

The court is persuaded that Thompson met the burden of establishing a prima facie case of discriminatory discharge. In that regard, Thompson, an African–American man, is a member of a protected class. Further, Price did not dispute that Thompson was qualified for the Disk Jockey job. Price conceded that Thompson has been involved in the radio broadcast industry for a number of years, and had performed his job at KCPX for six weeks without complaint from management as to his performance. Despite being qualified for the job, Thompson was discharged. Finally, while there was a dispute between the parties as to who took over Thompson's radio time slot, there is no question that someone handled the air time.

#### 2. *Thompson's Retaliation Claim*

The Court is also persuaded that Thompson met his burden to establish a prima facie cause of action for retaliatory dis-

---

**9.** The approach set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), as cited in *Trujillo v. Grand Junction Regional Ctr.,* 928 F.2d 973 (10th Cir. 1991), may be relaxed if there is *direct* evidence of discriminatory intent, such as an admission of defendant. *See Cunico v. Pueblo School Dist. No. 60,* 917 F.2d 431, 441 (10th Cir.1990). No such direct evidence exists in this case. In order to prevail, therefore, Thompson must rely on *indirect* evidence, and meet the requirements of *McDonnell Douglas Corp., supra.* See *E.E.O.C. v. Wendy's of Colorado Springs, Inc.,* 727 F.Supp. 1375, 1380–82 (D.Colo.1989).

**10.** *Trujillo v. Grand Junction Regional Center,* 928 F.2d 973, 976–77 (10th Cir.1991) (discriminatory discharge case); *Gulley v. Orr,* 905 F.2d 1383, 1385 (10th Cir.1990) (retaliatory discharge case).

**11.** While the burden to show a prima facie case of discrimination is on the plaintiff, the Courts have held that the burden "is not [to be] onerous." *Kenworthy v. Conoco, Inc.,* 979 F.2d 1462, 1469 (10th Cir.1992), citing *McDonald v. Eastern Wyoming Mental Health Center,* 941 F.2d 1115, 1119 (10th Cir.1991), *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

charge under Title VII of the 1964 Civil Rights Act. The Act provides:

It shall be unlawful ... for an employer to discriminate against any of his employees ... because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e–3(a).

The Tenth Circuit Court of Appeals has held that in order for a plaintiff to establish a prima facie cause of action for retaliation, the plaintiff must show by a preponderance of the evidence, that:

(1) [Plaintiff] engaged in protected opposition to discrimination or participation in a proceeding arising out of discrimination; (2) adverse action by the employer subsequent to the protected activity; and (3) a causal connection between the employee's activity and the adverse action.

*Archuleta v. Colorado Dep't of Inst.*, 936 F.2d 483, 486 (10th Cir.1991).

Thompson established that he was engaged in a protected activity at the time of his discharge from KCPX. In that regard, although there exists no business relationship between KDAB, the station against whom Thompson brought his discrimination suit, and KCPX, the law does not require such a relationship. *See Womack v. Munson,* 619 F.2d 1292 (8th Cir.1980) *cert. denied,* 450 U.S. 979, 101 S.Ct. 1513, 67 L.Ed.2d 814 (1981). If a relationship between employers was required, claimants would be discouraged from filing discrimination claims against former employers because of the fear that their present employers, upon learning of the claims, would fire them. The purposes of Title VII would, therefore, be frustrated.

Thompson also established the second requirement of a retaliation claim, by showing that subsequent to his filing of a suit against KDAB, he was fired by Price. Termination of employment clearly constitutes an "adverse action by the employer subsequent to the protected activity." *Archuleta v. Colorado Dep't of Inst.,* 936 F.2d 483, 486 (10th Cir.1991).

Finally, Thompson established, as a result of the timing of his discharge by KCPX and the filing of the claim against KDAB, that a causal connection existed between the protected activity and the adverse action, at least for purposes of proving a prima facie case.

A "causal connection" may be demonstrated by the proximity of the adverse action to the protected activity, provided, the employer ... had knowledge or it can reasonably be assumed he had knowledge of the plaintiff's protected activity.

*Harris v. Marsh,* 679 F.Supp. 1204, 1309 (E.D.N.C.1987). *See also Mckenna v. Weinberger,* 729 F.2d 783, 791 (D.C.Cir.1984); *Judge v. Marsh,* 649 F.Supp. 770, 783 (D.D.C.1986).

### C. Nondiscriminatory Reason for Termination

Having found a prima facie case for Thompson's discriminatory discharge claim and retaliatory discharge claim, the burden of production shifts to Price to show "a legitimate non-discriminatory reason for terminating the employee." *Bocage v. Litton Systems, Inc.,* 702 F.Supp. 846, 851 (D.Utah 1988) (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973)). In meeting its burden, Price need not prove that it was actually motivated by its non-discriminatory reason. As noted by the United States Supreme Court:

The burden that shifts to the defendant, therefore, is to rebut the presumption of discrimination by producing evidence that the plaintiff was rejected ... for a legitimate, nondiscriminatory reason. The defendant need not persuade the court that it was actually motivated by the proffered reasons.... It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff. To accomplish this, the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection. The explanation must be legally sufficient to justify a judgment for the defendant.

*Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 254-55, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1980) (citations omitted). The question of Price's actual motivation is only addressed after Price shows a legitimate non-discriminatory reason for Thompson's termination, and the burden of proof shifts back to Thompson under *McDonnell Douglas, supra.*

At trial, Price presented credible evidence that on the day before Thompson was to report to work, Thompson telephoned his supervisor at KCPX, Morgan Evans, to inform Evans that he was not going to come to work because of adverse weather conditions. Evans informed Thompson that the weather was not that bad, and that he expected him to report to work. When Thompson continued to refuse to commit to come to work, he was fired.

■ A refusal to work is a legitimate nondiscriminatory reason for terminating an employee. See *E.E.O.C. v. Wendy's of Colorado Springs, Inc.,* 727 F.Supp. 1375, 1385 (D.Colo.1989):

> The reason for terminating [the employee] that Defendant articulated was that he, "[r]efuse [sic] to work necessary time periods necessary [sic] to meet store needs." Refusal to work the time periods necessary to meet the demands of business demonstrates a lack of qualification for [the job]. Lack of qualifications is a legitimate, nondiscriminatory reason for terminating an employee.

■ In the radio broadcast industry, management is constantly concerned with the concept of "listener expectation." That concept is that listeners have expectations that when they tune to a certain radio station at a certain time, a particular music or news format will be in the process of being presented, and that a certain disk jockey will be on the air. By consistently fulfilling the listener's expectations, the radio station keeps the listener's loyalty, and can ask advertisers to pay for the privilege of broadcasting their messages to the listener. For the foregoing reason, broadcast employers legitimately expect their Disk Jockeys to make every effort possible to be on the air when scheduled. Thompson was unable to satisfy Price that he would make that effort. The Court determines, therefore, that Price had a legitimate reason to terminate Thompson.[12]

### D. Pretext

■ Price, having met its burden to articulate a legitimate nondiscriminatory reason for firing Thompson, the burden of proof shifts back to Thompson "to show that the employer's reason for termination is merely a pretext for discrimination." *Bocage,* 702 F.Supp. at 851 (citations omitted). Pretext can be shown "either directly by persuading the court that discriminatory reasons more than likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Beck v. Quiktrip Corp.,* 708 F.2d 532, 535 (10th Cir.1983) (quoting *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1980)).

■ Thompson attacked the credence of Price's proffered reason for discharging Thompson, by arguing that when he called Evans, KCPX's broadcast manager, on November 26, 1988, it was to merely inquire whether he could be excused from work and was not, as Price argued, a refusal to work. Thompson's argument was not supported by the evidence, however. Exhibits presented at trial clearly demonstrate that Thompson did not request a day off, but rather informed KCPX that he would not be coming to work the next day. Even if Thompson's initial telephone call to Evans on Saturday afternoon had been a request for Sunday off, Evan's turned down the request, and informed Thompson, through Mrs. Thompson, that Thompson was expected to report to work the next day. Instead of complying with the employer's demand, Thompson informed Evans, Saturday evening, that KCPX

---

12. By finding that Price had a legitimate reason for terminating Price, the Court is not expressing its agreement with Price's decision. Common decency would seem to demand that an employer should try to work with an employee who is having transportation problems in getting to work. Nonetheless, as long as no discriminatory or retaliatory intent exists, no violation of Title VII occurs.

did not pay him enough to risk his life by driving down to Salt Lake City from Ogden to do a shift.[13] Evans then fired him.[14]

Having failed to undercut the credence of Price's articulated reason for discharging Thompson, plaintiff next tries to prove pretext by arguing that "discriminatory reasons more than likely motivated [Price]" in firing Thompson. *Beck v. Quiktrip Corp.*, 708 F.2d at 535. In that regard, Thompson argues that the timing of the discharge is simply too close in time to Evans receiving notice of Thompson's lawsuit against KDAB, three to five days, to not establish that Evans and KCPX were motivated, at least in part, by the KDAB lawsuit in deciding to fire Thompson.

The difficulty with Thompson's "motivation" argument is that there is no evidence, other than the timing of the two events, to show that the news article relating to Thompson's lawsuit against KDAB played any part in the firing of Thompson by KCPX. This is not a case like *Womack v. Munson*, 619 F.2d 1292 (8th Cir.) *cert. denied* (1980), where the Eighth Circuit Court of Appeals found that the stated reason for discharging an investigator by a state district prosecutor was merely a pretext for firing because the decision to fire was made within a few days of the investigator having filed a discrimination lawsuit against his former employer, the county sheriff. In that case, the prosecutor called the investigator into his office immediately after learning about the lawsuit against the sheriff to inform the investigator that the lawsuit put the prosecutor's office in an embarrassing position. The prosecutor then asked the investigator to take a leave of absence, with pay, from the prosecutor's office and to look for other work. The Eighth Circuit Court of Appeals found that only after the investigator said that he did not want to get another job did the prosecutor start an investigation to determine if there was a "legitimate" reason to fire the investigator.

Unlike *Womack, supra,* in this case, Thompson, not Price, initiated the contacts which led to Thompson's termination. Price did not discuss the KDAB suit with Thompson, and did not look for an excuse to fire Thompson after finding out about the lawsuit. On the contrary, the evidence shows that when Evans was first informed by Thompson that Thompson was not coming in to work the next day, Evans did not fire Thompson but, rather, gave Thompson an opportunity to say that he would be coming into work. The Court is convinced that if Thompson had simply informed Evans on November 26, 1988, that he would be at the radio stations for his assigned time slot on Sunday, Thompson would not have been fired.

Even if Evans "had in mind" the KDAB lawsuit at the time that he fired Thompson, and there is no direct evidence that he did, Thompson's Title VII claims would still fail.[15] As noted by the Tenth Circuit Court of Appeals:

[O]nce a plaintiff in a Title VII case shows that [an illegitimate reason] played a moti-

---

**13.** In spite of Thompson's statement, the Court does not believe that Thompson would have been risking his life to make the 40 mile drive from Ogden to Salt Lake City on Sunday, November 27, 1988. Weather was clearing, and the hazardous road conditions of Northern Utah, found on Saturday, November 26, 1988, for northern Utah, were expected to improve for Sunday, November, November 27, 1988.

**14.** In listening to the testimony of Evans and Thompson, the Court is reminded of a statement in the case of *Monteiro v. Poole Silver Co.*, 615 F.2d 4 (1st Cir.1980) in which the Circuit Court quotes the trial court as follows:

I find this discharge to be essentially the result of a challenge by a volatile and voluble employee to the authority of a hard-nosed and short-fused supervisor. The result may have been unfortunate, but an action under Title VII does not provide a remedy.

*Id.* at 7. The statement sets forth in succinct fashion the evidence in this case.

**15.** *See Johnson v. Mast Advertising and Publishing, Inc.*, 1992 WL 41352, *7 n. 2, (D.Kan.1992), 1992 U.S. Dist. LEXIS 2860, *19 n. 2:

In a true mixed motive case, the plaintiff must "produce credible direct evidence that an employer actually relied on [race] ... in an employment decision." (Citations omitted.) To constitute "direct evidence," the plaintiff's proof must "speak directly to the issue of discriminatory intent" and "it must also relate to the specific employment decision in question." (Citation omitted.)

No direct evidence of discriminatory intent was presented by Thompson. See footnote 9 *supra*.

**1546**

vating part in an employment decision, the defendant may avoid a finding of liability only by *proving* that it would have made the same decision even if it had not allowed [the improper motive] to play such a role.

*Kenworthy v. Conoco, Inc.,* 979 F.2d 1462, 1471 (1992) (emphasis in original), quoting *Price Waterhouse v. Hopkins,* 490 U.S. 228, 24445, 109 S.Ct. 1775, 1787, 104 L.Ed.2d 268 (1989).[16]

Thompson did not raise the possibility that Price may have had mixed motives in firing him. If he had raised the possibility, however, the Court is convinced, after reviewing the evidence, that the result would be same. That is, the Court finds that Price would have discharged Thompson on November 26, 1988, even if no lawsuit had been previously filed by Thompson against his former employer, KDAB. Price needed Disk Jockeys that it could count on to make every reasonable effort possible to make their assigned shifts regardless of the weather. Thompson was not willing to make that effort.

### III. CONCLUSION

While Thompson established a prima facie case under Title VII on both his retaliatory discharge and discriminatory discharge claims, he was unable to show by a preponderance of the evidence that Price's legitimate nondiscriminatory reason for discharge was a pretext. No violation of Title VII was shown and judgment will be entered for the defendant, no cause of action on plaintiff's complaint. The court declines to award attorney fees under 42 U.S.C. § 2000e–5(k) for the reason that plaintiff was able to establish a prima facie case. See *E.E.O.C. v. Wendy's*

*of Colorado Springs, Inc.,* 727 F.Supp. 1375, 1386–87 (D.Colo.1989).

---

**16.** Section 107 of the Civil Rights Act of 1991 modifies the effect of *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) by providing that any discriminatory motivation in an employment practice gives rise to a Title VII claim, "even though other factors also motivated the practice." Quoted in *Stender v. Lucky Stores, Inc.,* 780 F.Supp. 1302 (N.D.Cal. 1992). The effective date for the Civil Rights Act of 1991 was November 21, 1991. While the Tenth Circuit Court of Appeals has not yet ruled

on whether or not the Act should be applied retroactively, *Patrick v. Miller,* 953 F.2d 1240, 1251 n. 6 (10th Cir.1992), this court is persuaded that it should not be. See *Smith v. Colorado Interstate Gas Co.,* 794 F.Supp 1035 (D.Colo. 1992); *Johnson v. Mast Advertising and Publishing, Inc.,* 1992 WL 41352 (D.Kan.1992), 1992 U.S.Dist. LEXIS 2860. Even if the Act were to be applied retroactively, however, the result would be the same. See footnote 15 *supra.*